**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**


**DENNY RAY SANFORD,**

      **Plaintiff,**

**vs.**                                            **Case No.  5:08cv43-RS/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Denny Ray Sanford, applied for disability insurance benefits.  Plaintiff was 42 years old at the time of the administrative hearing, R. 312, has a 10th grade education, R. 61, and has past relevant work as a truck driver, R. 57.  Plaintiff alleges disability due to back pain and depression.

The Administrative Law Judge found that Plaintiff has "severe" impairments, spinal stenosis, carpal tunnel syndrome, and depression, but that none meet or equal a Listed impairment.  R. 20.  The ALJ determined that Plaintiff has the residual functional capacity to do a limited range of light and sedentary work.  *Id.*  The ALJ determined that Plaintiff could still do his past relevant work as a truck driver as he performed it.  R. 25.  He also determined that Plaintiff could do other unskilled light and sedentary work as an assembler of small products.  *Id.*  He concluded that Plaintiff was not disabled as defined by Social Security law.  R. 26.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

    4.      Does the individual have any impairments which prevent past relevant work?

    5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**[1]

At the hearing on January 29, 2007, Plaintiff's attorney proffered that Plaintiff suffered a back injury in 1986 and had five surgeries.  R. 312.  He was "on disability from '86 to 1990 and returned to work."  *Id*.  It was represented that his back had become progressively worse since then, and he also had a stroke, which has caused him to fatigue easily and affected his memory.  *Id*.

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).

Plaintiff testified that he was out of work for about four years after his back injury. R. 319. He returned to work in 1990 and stopped work again a few years before the hearing because his back had become worse. *Id.* He was taking pain medication at that time, which included OxyContin,[2] Lortab,[3] and Percocet.[4] *Id.* He said that the pain medication caused memory loss, confusion, stomach irritation, and bleeding in the urinary and digestive systems. R. 320.

Plaintiff testified that since February, 2005, he had tried to work in a part-time sedentary job, "until they found out that I had a back problem." R. 313. He was taking pain medication then. R. 314. Plaintiff did not say that he was unable to do this job due to his back problem, side effects from his medication, or depression.

Plaintiff said he had not taken any pain medication for the last four months because he could not afford it and his insurance ran out. R. 313-314. He said he could not afford a morphine pump. R. 314. He said that he took about 20 pills a day of over-the-counter pain medications. R. 315.

---

[2] OxyContin is an opioid analgesic consisting of oxycodone hydrochloride; it has an abuse liability similar to morphine and is a schedule II controlled substance. It is used to manage moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. PHYSICIANS' DESK REFERENCE (2005).

[3] Lortab is one of the brand names for hydrocodone. PHYSICIANS' DESK REFERENCE (2004), p. 3233. Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[4] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain. It contains two drugs – acetaminophen and oxycodone. Acetaminophen is used to reduce both pain and fever. Oxycodone, a narcotic analgesic, is used for its calming effect and for pain. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said that he had pain in his back and right hip.  R. 315.  He said that the pain was intense when he twisted or sat for a long period of time.  *Id.*  He said he had passed out from the pain upon standing.  *Id.*  He did not use an assistive device for walking because that made the pain worse.  *Id.*  He said that he got leg cramps, back cramps, and severe headaches when he sat.  *Id.*  Plaintiff said that the headaches were not related to his other symptoms, but occurred on their own.  R. 316.  Plaintiff said that he suffered pain between 6 and 10 on a scale of 10 every day.  R. 320.

Plaintiff said that after walking around a store for an hour, he had to spend the day in bed.  R. 321.  Some days, though, he can walk for a couple of hours with no problems.  *Id.*  He said that he spends the entire day in bed a couple of days each week.  R. 322.

Plaintiff said that he has carpal tunnel syndrome in his wrists and this causes his fingers and hands to be numb.  R. 317.  He could not afford treatment for carpal tunnel syndrome.  *Id.*  He said: "My wife dropped me off of the insurance."  R. 318.

Plaintiff said that he had had two strokes, one in September and the other in November, 2005.  R. 323.  He said he still had headaches and memory loss from these strokes.  *Id.*  He said that he had numbness on both sides and impaired speech from the strokes.  R. 327.  He said he had almost fully recovered, however.  *Id.*

Plaintiff said he was also treated for depression.  R. 318.  He said he had been dealing with depression "ever since I first broke my back."  *Id.*  He said that he had never been on medication for depression, but then said he had taken Paxil.  *Id.*

The vocational expert testified that Plaintiff had said that his work as a truck driver did not require any lifting, was a sedentary job for 12 hours, and therefore was a

sedentary job.  R. 329.  The ALJ asked the vocational expert to assume a person "with the claimant's vocational profile," limited to sedentary or light work, with no repetitive pushing or pulling in the upper or lower extremities, not kneeling or crawling, occasionally required to stoop or crouch, no exposure to extreme hot, cold, wet, or humid weather, no vibrating surfaces or objects, no exposure to dangerous machinery or high places, and no complex or detailed work due to the need to take pain medications.  R. 329-330.  The expert said that such a person could do Plaintiff's job as a truck driver as he performed it, and that there were many such unskilled jobs in the national economy.  R. 330-331.  She also said that Plaintiff would be able to do sedentary or light work as a small products assembler, and there were many such jobs as well.  R. 331.  The expert said that if a person had to leave such a job two or three times a day for as much as 30 minutes, or if a person were absent for three days a month, then the job would not be available because "no employer would tolerate that."  R. 332.

**Medical Evidence**

Plaintiff fell 75 feet from a tower while working in 1987 and suffered fractures at L1-L4 level of his spine.  R. 270.  He had a solid fusion through that region, and five surgeries.  *Id.*  He has had chronic pain from this injury since then.  *Id.*  He returned to work in 1989, and worked until February, 2005.  *Id.*

On July 13, 2004, Plaintiff had an MRI of the lumbar spine.  R. 301.  The impression was previous surgery with likely fusion at the L2-3 level, no bony spinal stenosis or focal disk herniation detected, and facet arthropathy at the L4-5 and L5-S1 levels.  R. 301.

Plaintiff was examined by Dr. Richard F. Fellrath, an orthopedic specialist, on January 5, 2005.  R. 116.  There are no notes from the physical examination relative to the subjective complaints.  *Id*.  Plaintiff complained of radicular pain, decreased ability to walk due to pain, the need to use a grocery cart for support to walk, morning stiffness, night pain, and parasthesias, but had no weakness or clumsiness in the upper or lower extremities.  *Id*.

On the same day, January 5, 2005, Plaintiff was seen by Karin S. Maddox, M.D., at the Brain and Spine Center, relating that he had been "electrocuted" on December 25, 2004.[5]  Plaintiff stated that he was in the hospital for three days and has had numbness in both arms since that time, but without weakness or radiating neck pain.  R. 292.  While he complained of swollen tender joints, recurrent joint, pain, instability, lack of mobility, low back pain, and hip pain, he was found to be in "no apparent distress." *Id*.  He had "normal bulk and tone," had normal strength in all extremities, and had no muscular atrophy.  R. 293.  "Tandem walking, station, and base were all examined and were normal."  *Id*.  A nerve conduction study was ordered.  *Id*.

On February 11, 2005, Plaintiff was seen again by Dr. Fellrath.  R. 113.  He complained of low back pain, bilateral leg pain, paresthesias, and weakness.  *Id*.  Upon examination, Dr. Fellrath noted that Plaintiff had no superficial or deep tenderness to light touch over a broad area of the spine, no lumbar pain on axial loading of the cervical spine while standing, no pain with synchronous axial rotating, no straight leg raising discrepancy, and no signs of overreaction to the examination.  *Id*.  Plaintiff was

---

[5] Electrocution is death by electrical shock.  Plainly Plaintiff meant that he had been severely shocked.

found to have normal development, without deformity.  *Id.*  Plaintiff had no peripheral

swelling.  *Id.*  Plaintiff's gait was slightly wide-based and antalgic.  *Id.*  Plaintiff had "full

physiologic range of motion in flexion, extension, rotation and lateral bending" of the

cervical spine, with no muscle spasm and full motor strength.  *Id.*  All other cervical

spine tests were negative.  *Id.*  It was found that Plaintiff had spinal kyphosis[6] and

scoliosis,[7] but this was "well compensated."  *Id.*  All tests of the thoracic spine were

normal.  R. 114.  Dr. Fellrath made the following observations concerning Plaintiff's

lumbar spine:

> The patient has normal appearance of the lumbar spine without atrophy or
> cutaneous lesions such as cafe-au-lait spots, scars or other pathology.
> The patient has Normal tone and stability of the spine and paraspinal
> muscles bilaterally without atrophy or muscle spasm on palpation.  The
> patient as full range of motion of the hips and knees bilaterally without
> provocation of local symptoms.  4/5 strength in Quads, 4/5 strength in
> Hamstrings, 4/5 strength in Ankle plantar flexors, 4/5 strength in Ankle
> dorsiflexors, 4/5 strength in EHL's.  The patient has normal sensation to
> light touch in L2, L3, L4, L5, and S1 Distributions bilaterally without
> hypesthesia, with the exception of hypesthesia in a patchy,
> nondermatomal distribution.  Deep tendon reflexes were: Diminished
> (trace – 1/4) at the knees and ankles bilaterally.  Pulses were: normal (2/4)
> at femoral, popliteal, dorsalis pedis and posterior tibial bilaterally.  The
> patient has negative Babinski, negative Oppenheim maneuver and
> negative lower extremity clonus bilaterally.  The patient had negative
> straight leg raising, negative bowstring sign, negative nerve root tension
> provocation signs bilaterally.

R. 114.  Dr. Fellrath looked at the radiological report and said that these were "normal

for age and habitus."  *Id.*  He found no acute fracture, dislocation, or "other acute

---

[6] Kyphosis is the abnormally increased convexity in the curvature of the thoracic
spine as viewed from the side; called also hunchback.  DORLAND'S ILLUSTRATED MEDICAL
DICTIONARY.

[7] Scoliosis is an appreciable lateral deviation in the normally straight vertical line of
the spine.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

pathology," and the fusion from prior surgeries appeared "well consolidated though he is in kyphosis and has strut grafts from L2 to L4.  He has compensated kyphoscoliosis from the injury."  *Id.*  The MRI, in Dr. Fellrath's opinion, revealed no acute pathology of the lumbar spine.  *Id.*  The assessment was "complex back pathology" related to the injuries and prior surgeries.  *Id.*  No surgery was indicated.  *Id.*  Plaintiff requested narcotic pain medication, and he was amenable to refer Plaintiff for an epidural steroid injection.  R. 114-115.  He recommended that Plaintiff be referred for pain management "as he is likely to require this," and for follow-up with Dr. Maddox and Dr. Malik "for his bowel and bladder symptoms."  R. 115.  No follow-up appointment was scheduled.  *Id.*

On February 17, 2005, Plaintiff was seen by another physician, Roger Spencer, at the Panama City Surgery Center.  R. 90.  The diagnosis was spinal stenosis.[8]  *Id.* Plaintiff said that he had had increased pain in the prior three years.  *Id.*  He described pain, cramps, weakness, occasional collapsing of his left side, and intermittent decreased sensation in his right lower leg, but Dr. Spencer said "he remains fairly functional."  *Id.*  Plaintiff said he had never had an epidural injection for pain.  *Id.* Plaintiff reported that he was then employed as a truck driver.  *Id.*  His current medications included Diovan and Percocet, and he was apparently driving the truck while using these medications.  *Id.*  Upon examination, Dr. Spencer found Plaintiff to be pleasant and in no apparent distress.  *Id.*  He had full range of motion of his neck.  R. 91.  Surgical scars were observed on Plaintiff's back, but he had only "slightly decreased range of motion with flexion, extension, and rotation," and only "mild

---

[8] Stenosis is an abnormal narrowing of a duct or canal.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

tenderness to deep palpation across his lumbar paraspinal muscles." *Id.* Plaintiff's lower extremities had "full range of motion," but with loss of light touch below the left knee. *Id.* Plaintiff was found to have "near normal strength with respect to hip flexion extension, knee flexion extension, and dorsi and plantar flexion at the ankle. *Id.* Straight leg raising test, however, elicited pain across the lower back and posterior legs when greater than 45 degrees. *Id.* Dr. Spencer's impression was "severe spinal stenosis." *Id.* Plaintiff was administered "an L4-5 and L5-S1 epidural steroid injection." *Id.*

On February 28, 2005, Plaintiff was seen again by Dr. Fellrath. R. 112. Plaintiff reported that he had had about eight days of relief following the steroid injection, and "then has had full resumption of symptomatology." *Id.* Dr. Fellrath found no change in physical examination from previous notes. *Id.* Dr. Fellrath felt that it was unlikely that additional injections would help, and he did not think that surgery was needed either. *Id.* Dr. Fellrath felt that Plaintiff should be referred to someone else for management of chronic pain. *Id.* Plaintiff asked for Darvocet[9] and Percocet. *Id.* Dr. Fellrath said that Percocet is a "very strong pain medication," and should not be taken on a daily basis, but only for "occasional use." *Id.* Dr. Fellrath said that if Plaintiff returned to work as a truck driver, he should not do any heavy lifting, though he said "I cannot say that there is absolute contraindication." *Id.* He did not caution against driving a truck while taking Percocet.

---

[9] Darvocet-N 50 or 100 contains propoxyphene hydrochloride, a mild narcotic analgesic related to methadone. PHYSICIANS' DESK REFERENCE (2004), pp. 403-404.

Dr. Spencer saw Plaintiff again on March 11, 2005.  R. 80.  Dr. Spencer administered another epidural injection at L5-S1.

Plaintiff saw Dr. Fellrath on March 30, 2005, who noted that he had short term, but not long term, relief from the steroid injections.  R. 111.  Dr. Fellrath again said that Plaintiff needed pain management and recommended referral to Dr. Gaiser for an evaluation.  *Id.*

Corey D. Gaiser, D.O., saw Plaintiff on June 6, 2005.  R. 109.  Dr. Gaiser noted that Plaintiff had not been working since February, 2005.  *Id.*  Upon physical examination, Dr. Gaiser found that Plaintiff's gait was normal, not antalgic.  *Id.*  He was able to heel and toe walk effectively, and Trendelenburg testing[10] was negative.  *Id.*  There was no muscle atrophy in the lower extremity, and strength was equal and completely intact.  *Id.*  In the lumbar spine, Dr. Gaiser found that Plaintiff had full range of motion without paraspinal tenderness upon palpation.  *Id.*  There was no pain with palpation or range of motion.  *Id.*  "Forward flexion is to patient [sic] can touch the floor, extension is to +20, side bending and rotation is normal."  *Id.*  Dr. Gaiser's impression was solid fusion L2-4, L3 burst fracture, and bilateral lower extremity radiculopathy.  *Id.*  Plaintiff was sent to Dr. Shores for a morphine pump and for follow-up.  R. 110.

---

[10] Trendelenburg sign or Trendelenburg test is performed for two purposes, for varicosity and condition of heart valves and for gluteus medius function.  The latter test was probably intended here, for hip function.  The patient, standing erect with back to the examiner, lifts first one leg and then the other. If when weight is supported by an affected limb, the pelvis on the sound side falls instead of rising, this indicates disturbance of the gluteus medius mechanism, such as deformity of the femoral neck, dislocation of the hip joint, or weakness or paralysis of the gluteus medius muscle. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

Plaintiff was seen by Aaron J. Shores, M.D., on July 6, 2005, at the Pain Clinic of Northwest Florida.  R. 270.  Dr. Shores noted the prior injury, surgeries, and prior treatment with physical therapy, a TENS unit, two injections, and medications.  *Id.* Plaintiff had been referred to Dr. Shores for a morphine pump and follow-up pain management.  *Id.*  Plaintiff described his pain as constant, sharp, and pounding, radiating from his lower back to right extremity.  *Id.*  He said his pain is increased by bending forward or twisting left or right, with most of the pain in his back.  *Id.*  He said that the pain increases with sitting, standing, stress, physical activity, cold or damp weather, coughing, or lying down in all positions.  *Id.*  He said that his pain level that day was 10 out of 10, but usually was 5 to 8 out of 10.  *Id.*, R. 270-271.  He said that his pain makes normal functioning difficult most of the time.  R. 271.  On physical examination, Dr. Shores found Plaintiff to be in no acute distress.  R. 272.  He found a loss of lumbar lordosis and tenderness along the lumbar paraspinal muscles.  *Id.* Straight leg raising was negative, however.  *Id.*  Plaintiff's strength was 5/5 in the upper and lower extremities, except for 2/5 with bilateral ankle dorsiflexion.  *Id.*  The assessment was failed low back syndrome and cauda equina syndrome.[11]  *Id.*  Dr. Shores concluded that he was not sure that Plaintiff would ever going to be completely pain free.  *Id.*  He said that "[t]he goal of his treatment should be in controlling his pain

--------------------------------------------------

[11] The cauda equina is the collection of spinal roots that descend from the lower part of the spinal cord and occupy the vertebral canal below the cord, resembling the tail of a horse.  Cauda equina syndrome is a dull aching pain of the perineum, bladder, and sacrum, generally radiating in a sciatic fashion, with associated paresthesias and areflexic paralysis, due to compression of the spinal nerve roots.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

while trying to increase the quality in his activities of daily living." *Id.* He referred

Plaintiff for a Minnesota Multiphasic Personality Inventory (MMPI). R. 273.

Plaintiff returned to Dr. Shores on July 15, 2006. R. 268. He was taking five or

six Percocet tablets a day, more than he was supposed to use. *Id.* Dr. Shores

explained to Plaintiff that he was "not to use his medications on his own." *Id.* Dr.

Shores said that Plaintiff "does seem to have some impulsive tendencies." *Id.* Dr.

Shores said: "I believe that he is hurting, but there does seem to be a great deal of

anxiety and psychosocial overlay confounding some of his symptomatology." *Id.* Dr.

Shores thought that a longer-acting narcotic was needed since Plaintiff "is using so

much narcotic." *Id.* He discontinued Percocet and recommended OxyContin by pump

for a three day trial. *Id.*

On July 22, 2005, Plaintiff went to the Gulf Coast Medical Center complaining of

syncope[12] while mowing his lawn and again while standing up, and increased pain due

to these falls. R. 120, 122. He reported to the physician:

> The patient was in his usual state of health, doing fine. Tuesday he went
> outside, worked outside for two to three hours and since then he has had
> two syncopal episodes. He says he drank some water, but did not have
> anything else to drink.

R. 122. He was admitted to the hospital for further evaluation. *Id.* The diagnosis was

syncope from dehydration. R. 124. The next day, he was examined by Karin S.

Maddox, M.D., who found his strength to be within normal limits, with normal bulk and

tone. *Id.*, R. 121.

---

[12] Fainting. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

On August 12, 2005, Plaintiff was seen again by Dr. Shores.  R. 264.  He was

using OxyContin "not as directed."  *Id*.  He rated his back pain at 6 out of 10.  *Id*.  He

was sitting in a chair in no acute distress.  *Id*.  Tenderness along the lumbar paraspinal

muscles was noted.  *Id*.  It was noted that the MMPI "suggests that he has possible

addictive tendencies and [is] prone to schizophrenia."  *Id*.  Dr. Shores said he was

"somewhat surprised" by the MMPI results, as "he does not seem to have

schizophrenia, in my opinion."  R. 265.  Still, he thought it prudent to refer Plaintiff to a

psychiatrist.  *Id*.  Implantation of an intrathecal OxyContin pump was deferred due to the

syncopal episodes.  *Id*.  Dr. Shores said that he told Plaintiff that he should not be using

the OxyContin on an "as needed" basis, and if he did it again, he would discharge him

and not consider him for an intrathecal pump.  *Id*.  Dr. Shores further noted:

> After leaving the examination room, his wife asked to speak to me
> privately.  We spoke for 15 minutes.  She stated that she has concerns
> that he exaggerates his symptoms and actually feels better when he gets
> attention for being sick.  She is not convinced that he has had a stroke.

*Id*.  Dr. Shores discharged Plaintiff with 90 tablets of OxyContin, and planned for a urine

drug screen on the next visit.  *Id*.

Dr. Shores made a note on August 17, 2005, because Plaintiff had called and

"wanted to discuss disability."  R. 262.  He said that Dr. Fellrath had previously given

him a note that he "can no longer work," and his trucking employer fired him.  *Id*.  He

wanted a note from Dr. Shores "to keep him from paying child support."  *Id*.  Dr. Shores

said he told Plaintiff that he would not write such a note.  Dr. Shores further noted: "I am

not sure what to make of these statements, particularly since Mr. Sanford's wife states

that he has a tendency to exaggerate his symptoms."  *Id.*  Dr. Shores did not think

Plaintiff could drive a truck:

> since he is on high does narcotics, but I am not convinced that this means
> he cannot work either.  I suspect he could find a more sedentary position.
> He has been encouraged to attempt to do so.

*Id.*

Plaintiff was seen on a consultative basis by Dhranit Vijapura, M.D., a

psychiatrist, on August 31, 2005.  R. 219.  Plaintiff said that he felt sad and depressed,

and he "misses his children."  *Id.*  He and his current wife had children ages 13, 15, and

17.  *Id.*  Plaintiff expressed fear of the morphine pump.  R. 220.  On a psychological

test, Plaintiff had a score suggesting severe depression, which was fully consistent with

the clinical impression.  *Id.*  The diagnosis was major depression, recurrent.  R. 221.  A

GAF score of 50 was assigned on Axis V, with a past GAF of 60.  *Id.*  Dr. Vijapura

placed Plaintiff on a trial of Cymbalta,[13] and Plaintiff was to follow up with him.  *Id.*

On September 14, 2005, Plaintiff returned to Dr. Shores.  R. 259.  He told Dr.

Shores that Dr. Vijapura placed him on Cymbalta and he said "that he is doing better."

*Id.*  He was properly using the OxyContin, and it was doing "a good job controlling his

pain."  *Id.*  He did not bring his pill bottles to the office as ordered, however.  *Id.*  He

rated his back pain at 6 out of 10.  *Id.*  Dr. Shores noted increased tone in the lumbar

paraspinal muscles.  *Id.*  Dr. Shores was still not comfortable in proceeding with the

intrathecal pump.  *Id.*  Dr. Shores wanted Plaintiff to followup with Dr. Malik, and bring

his pill bottles and his wife to the next appointment.  *Id.*  Dr. Shores was still "concerned

---

[13] Cymbalta is used to treat major depression.  PDRhealth™, PHYSICIANS DESKTOP
REFERENCE.

that there is still a great deal more psychosocial overlay confounding his symptomatology." *Id.*  He wanted to get to know Plaintiff better first.  *Id.*  Plaintiff was to return on October 13, 2005, and a urine drug screen was recommended.  R. 260.

Plaintiff returned on October 12, 2005, to Dr. Shores, and his wife came with him. R. 256.  He was seen by Ann Marshal, A.R.N.P.  Both Plaintiff and his wife were "argumentative with each other the entire visit."  *Id.*  Plaintiff's wife said that "he is not taking his medications appropriately."  *Id.*  Plaintiff said that he had aching lumbar pain radiating across his back with numbness, worse on the right side.  *Id.*  Plaintiff was very interested in starting the morphine trial.  *Id.*  Plaintiff's wife wanted to change his medication to Percocet because he was "very mean when taking the OxyContin and that he did not act that way on the Percocet."  *Id.*  Nurse Practitioner Marshal said: "I told him very specifically that he has to take OxyContin 3 times a day, no more and no less, and he understands that."  *Id.*  Plaintiff again did not bring his pill bottles as instructed, and he was told again he had to bring them in so that his medications could be counted.  *Id.*, R. 257.

Dr. Shores saw Plaintiff again on October 21, 2005.  R. 253.  Plaintiff had had a sudden onset of sharp back pain the night before, having rolled out of the bed quickly. *Id.*  He was having difficulty walking, and experienced numbness and a sharp pain.  *Id.* Plaintiff was examined by Dr. Shores.  *Id.*  He was seated and in no acute distress.  *Id.* Dr. Shores noted "sensitivity to palpation" "which [said Dr. Shores] seems out of proportion to examination."  *Id.*  Straight leg raising was positive.  *Id.*  Hyperesthesias and decreased sensation was observed on the right foot, "which is new."  *Id.*  Plaintiff's strength was 5/5 in the upper and lower extremities, "except 4/5 with right ankle

dorsiflexion, but this appears pain inhibited."  *Id.*  Dr. Shores thought it prudent to repeat the MRI of Plaintiff's thoracic and lumbosacral spine due to the positive straight leg raising test.  *Id.*  He said again, though, that the "sensitivity in his right flank does seem out of proportion to exam," and Plaintiff "has a history of being somewhat histrionic and tangential about his pain complaints."  R. 254.

An MRI of Plaintiff's lumbar spine was taken on October 21, 2005.  R. 251.  The impression of the radiologist, Thomas D. Brown, M.D., was:

1.      Degenerative changes are present at the lower four lumbar
         levels, most prominently fro L2-3 to L4-5.  Postsurgical
         changes are noted at L2-3 and L3-4 with fusion of the
         posterior elements bilaterally at both levels and a partial
         fusion of the disc spaces on the left at both levels.  No focal
         disc abnormality is seen.

2.      A L4-5 bulging disc material and degenerative changes
         cause moderate foraminal stenosis on the right with mild
         foraminal stenosis on the left.  There is no significant spinal
         canal stenosis.  No focal disc abnormality is identified.  The
         remainder of the examination is as described above.

R. 252.  The thoracic MRI was negative.  R. 250.

Plaintiff returned to Dr. Shores on October 24, 2005, rating his pain at level 10.  R. 247.  Again, he was sitting in a chair in no acute distress.  *Id.*  Increased muscle tone was observed in the lumbar paraspinal muscles.  *Id.*  Plaintiff had numbness of the right hand (which he said he had had for some time), but Tinel[14] and Phalen's[15] signs were

---

[14] Tinel's sign is:  "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[15] "Phalen's test is used in carpal tunnel syndrome where forcible palmar flexion of the wrist causes venous engorgement of the canal and an exacerbation of the symptoms."  Gpnotebook (www.gpnotebook.co.uk).  "Phalen's maneuver is described

negative.  *Id.* and R. 248.  Dr. Shore's comment on the MRI results was: "post surgical

changes at L2-3 and L3-4 with fusion of the posterior elements and moderate right-

sided L4-5 spinal canal stenosis."  R. 247.  Dr. Shore's assessment was new onset right

lower extremity L4-5 radicular symptoms and right hand numbness.  R. 248.  A trial of a

lumbar epidural steroid injection was recommended.  *Id.*  An EMG[16] and a nerve

conduction study of the right upper extremity were also ordered.  *Id.*  The epidural was

administered on October 27, 2005.  R. 245.

The electrodiagnostic study on November 4, 2005, was abnormal.  R. 243.  Dr.

Shores said that "[t]here is electrodiagnostic evidence of a subacute right L5

radiculopathy superimposed on a chronic L3, L4, L5 radiculopathy."  *Id.*  On the same

date, Plaintiff said he had had a 20% to 30% improvement from the epidural.  R. 241.

Dr. Shores's assessment was subacute L4 and L5 radiculopathy and failed back

syndrome.  *Id.*

Plaintiff was seen by Stephanie Breland, A.R.N.P., for Dr. Karin Maddox on

December 12, 2005.  R. 288.  His complaint was memory loss, but the information he

gave "is all very sketchy."  *Id.*  Nurse Breland noted: "Patient still continues to request a

note stating that he can no longer work so he can retrieve his driver's license back and

not have to pay child support."  *Id.*  She discussed this at length with Dr. Maddox, and

---

as follows:  the size of the carpal tunnel is reduced by holding the affected hand with the
wrist fully flexed or extended for 30 to 60 seconds, or by placing a sphygmomanometer
cuff on the involved arm and inflating to a point between diastolic and systolic pressure
for 30 to 60 seconds."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[16] Electromyography, that is, an electrodiagnostic technique for recording the
extracellular activity of skeletal muscles at rest, during voluntary contractions, and
during electrical stimulation.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

Dr. Maddox was not willing to do that at this time because she had not been following

Plaintiff long enough to express such an opinion.  *Id.*  On examination, Nurse

Practitioner Breland found that Plaintiff had no muscular atrophy, and his strength was

5/5 bilaterally in all extremities.  *Id.*  Gait, tandem walking, station, and base were all

normal.  *Id.*  Regarding memory loss, Nurse Practitioner Breland noted a normal "mini

mental examination," and found the MRI to be normal.  *Id.*  She recommended that

Plaintiff stop using MS Contin.[17]  R. 289.  She also observed:

> Also discussed with him that we will not support the idea of writing a note
> that he could not work at this time since we have not seen this patient long
> enough to be able to determine that.  That patient went into a lot of detail
> of the reasons why he can not work and that he has been a truck driver for
> many years and that he would have a hard time trying to do anything else.
> Advise the patient that maybe he should consider trying to do a desk job.
> He states that he is not able to do that.  Assured this patient that we would
> not be able to help him in regards to this, . . . .

*Id.*  Plaintiff was to continue in the care of Dr. Shores and Dr. Malik.  *Id.*  Plaintiff was

cautioned against driving or operating heavy machinery while taking medications with

possible sedative effects.  *Id.*

About two weeks later, on December 21, 2005, Amer R. Malik, M.D., of Panama

Internal Medicine Associates, wrote a letter in which he stated:

> Mr. Sanford is a patient of mine and is under my care with the diagnosis of
> DJD L.S. Spine, Hypertension, Depression and Anxiety.  Mr. Sanford
> suffers from Chronic Pain due to the above mentioned diagnosis which
> interferes with his daily activities.  With this being said, it is my

---

[17] MS Contin, a controlled-release tablet containing morphine, is used to relieve
moderate to severe pain.  While regular morphine is usually given every 4 hours, MS
Contin is typically taken every 12 hours – only twice a day.  The Kadian brand may be
taken once or twice a day.  The drugs are intended for people who need a morphine
painkiller for more than just a few days.  PDRhealth™, PHYSICIANS DESKTOP
REFERENCE.

professional medical opinion that due to Mr. Sanfords' [sic] ongoing medical conditions, he is permanently disabled.

R. 300.

Plaintiff was referred by Dr. Malik to Comprehensive Pain Medicine, Ata Ul Mohsin, M.D., and saw Dr. Mohsin on February 27, 2006. R. 305. Plaintiff said that Dr. Shores had recommended a morphine pump, "which he declined." *Id.* Plaintiff also said that he was not satisfied with the care given by Dr. Shores, and had stopped going to him. *Id.* Plaintiff complained of pain at the 10 level, and described it as burning, sharp, stabbing, and stinging in the lower back sometimes radiating to the right lower extremity. *Id.* Dr. Mohsin did not have any records from Dr. Shores's office. *Id.* On examination, Dr. Mohsin found Plaintiff to be in no acute distress. R. 306. His gait was found to be antalgic. *Id.* Plaintiff could sit, stand, and walk without assistance, but was unable to stand and walk on heels and tip toes. *Id.* Romberg's sign[18] was negative. *Id.* Plaintiff was found to have full range of motion in his neck, lower back, and major joints. Discrete tender points were found on the SI area and lower lumbar spine. *Id.* Muscle strength and tone were normal. *Id.* Straight leg raising was negative on both the right and left side. *Id.* The assessment was chronic low back pain, failed back syndrome, muscle spasms, bilateral sacroiliac disease, and chronic use of narcotic medications. R. 307. Dr. Mohsin did not agree with the current medication regimen of three

---

[18] Swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

OxyContin tablets a day, and he allowed 20 mg. b.i.d. (twice a day).[19]  *Id.*  He provided

Skelaxin for muscle spasms.  *Id.*

**Legal Analysis**

> **Whether the ALJ followed the law of the Eleventh Circuit in making
> his findings as to the credibility of Plaintiff's testimony**

Plaintiff contends that the Administrative Law Judge failed to follow this circuit's

law governing credibility findings.  Pain and other symptoms reasonably attributed to a

medically determinable impairment are relevant evidence for determining residual

functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may

affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).

Plaintiff cites Geiger v. Apfel, 2000 WL 381920 (M.D. Fla. Feb 09, 2000) (No.

6:99-CV-12-ORL-18B) for the proposition that the ALJ erred by requiring that there be

objective proof both of the severity of the condition and of the limitation.  Doc. 12, p. 17.

In that case, the magistrate judge wrote:

---

[19] Bis in die (Latin); twice a day.
MEDILEXICON, found at:  http://www.medilexicon.com/medicalabbreviations.php

Here, the ALJ found that Plaintiff has a medically determinable condition that can produce the *symptoms* he alleges, "but his complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone" (R. 14G).  The ALJ proceeds to reject Plaintiff's complaints of achiness and fatigue as "clearly inflated."

In so holding, the ALJ misapplies the pain standard by, in effect, requiring both objective medical evidence of the severity of the condition and objective medical evidence of the severity of the limitation.  Such is not the law.  As set forth above, and acknowledged by the ALJ, Plaintiff "has medically determinable conditions that can produce the *symptoms* he alleges" (R. 14G).  This finding, on its face, meets prongs one and three of the pain standard.

*Id.*, *7 (emphasis added).

This holding would appear to apply to the case at bar as the ALJ here found that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged *symptoms*, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 24 (emphasis added).  I note, however, that the statements of the ALJs in the case at bar and in the Geiger case did not explicitly follow the Eleventh Circuit's wording of the standard.  Part 2(b) of the pain test as set forth by the Eleventh Circuit is that "the objectively determined medical condition can reasonably be expected to give rise to the *claimed pain*," not the "symptoms."  A headache in general may be a symptom of the flu or something else, whereas the "*claimed* pain" of a headache, mild or disabling, is quite another thing.  The Eleventh Circuit standard goes to the heart of the matter, the *severity* of the pain, not just that some pain (i.e., a symptom) exists.  Neither the ALJ in Geiger nor the ALJ here found that "the objectively determined medical condition can reasonably be expected to give rise to the *claimed pain*," for had they done so, they would have fully credited the claimant's testimony as to the severity of the pain suffered.

It is true, as Plaintiff argues, that an ALJ may credit subjective pain testimony even if objective evidence is lacking.

> A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  *Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence*.

Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (emphasis added, citations omitted).  But this is merely permissive guidance.  It does not mandate belief in the subjective testimony where the substantial evidence in the record indicates otherwise.  After all, in making the credibility finding, the ALJ is directed to articulate the findings based upon substantial evidence.  Substantial evidence may consist of objective medical findings, a lack of objective medical findings, evidence of exaggeration, inconsistencies in activities of daily living, failure to pursue recommended physical therapy or to take prescribed medications, and the like.

After reviewing all of the medical evidence, R. 22-24, the ALJ determined that "the objective evidence fails to substantiate the claimant's subjective allegations of total disability."  *Id*.  He reasoned:

> While [Plaintiff] may experience some pain with prolonged strenuous activity, the record shows that he is able to move about in a satisfactory manner.  He has required no frequent hospitalizations or emergency room treatment for his alleged pain.  Although Dr. Malik noted significant limitations in the claimant's ability to engage in work-related activities, the objective evidence fails to support this degree of limitations.  Physical examination by pain specialist, Dr. Mohsin, revealed full range of motion in his neck, lower back and all major joints.  He had discrete tenderness on both S1 area and lower lumbar spine area.  Muscle strength was 5/5 in all four extremities.  Deep tendon reflexes were 2+ in the upper and lower extremities.  Straight leg raising was negative bilaterally.  The claimant was advised to look for a more sedentary job, and would also benefit from vocational rehabilitation.  The record also reveals possible symptoms magnification.  The Administrative Law Judge does not discount all of the

claimant's complaints; however, there is very little objective evidence to
support the claimant's allegations of a total inability to work.

R. 24.

All of these findings are supported by substantial evidence in the record,

discussed at length above, and do not misapply this circuit's pain standard.  There was

objective medical evidence to discount Plaintiff's testimony.  As Respondent notes in the

responsive memorandum, the examining and treating physicians repeatedly found

Plaintiff to be in no acute distress, his gait was usually normal, and was antalgic on only

two occasions, he had no muscle atrophy and had full strength, he had full range of

motion of his spine, he generally had no tenderness to palpation of his lower back, the

straight leg raising test was usually negative, and the MRI scans did not show any

significant changes other than the spinal changes from the surgeries twenty years

earlier.  Doc. 17, p. 5.  Further, there was substantial evidence to support a finding that

Plaintiff magnified his symptoms.  There was substantial evidence that Plaintiff wanted a

physician to declare him disabled so that he would no longer have to pay child support,

and Dr. Fellrath, Dr. Shores, and Nurse Practitioner Breland all felt that Plaintiff was

capable of doing some sort of work.  Dr. Fellrath advised that Plaintiff only avoid heavy

lifting.  R. 112.  Dr. Shores said that while driving a truck was not a good idea, some

other work might be appropriate.  R. 262.  Nurse Practitioner Breland advised Plaintiff to

get a desk job.  R. 289.  Moreover, the lack of objective evidence was a sufficient

reason to discount the opinion of Dr. Malik.[20]  Indeed, there are no treatment records

from Dr. Malik in this record.

In summary, while there was some evidence to the contrary, this court cannot

substitute its judgment for that of the Commissioner if, as here, the Commissioner's

judgment is supported by substantial evidence.  Consequently, the ALJ properly

followed this circuit's pain standard, and his findings are supported by substantial

evidence.

### Whether the ALJ's evaluation of Plaintiff's mental impairment is supported by substantial evidence

With respect to mental impairments, the ALJ found that Plaintiff suffers only mild

limitations of activities of daily living, moderate limitations in maintaining social

functioning, and mild impairment in maintaining concentration, persistence, or pace.  R.

25.  Plaintiff argues that these findings are not supported by substantial evidence in the

record.  Doc. 12, p. 20.  Plaintiff contends that the ALJ rejected the findings of Dr.

Vijapura and substituted his own.  *Id.*  Plaintiff also argues that the ALJ erred by not

incorporating these non-exertional limitations into his residual functional capacity (RFC)

determination.  *Id.*, p. 21.

---

[20] The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is *not bolstered by the evidence*; (2) evidence supported a contrary finding; or (3) treating physician's opinion was *conclusory* or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004) (emphasis added); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").

The ALJ did incorporate these limitations into his residual functional capacity determination.  He determined that Plaintiff was "limited in his ability to interact appropriately with others due to depression."  R. 25.  He also found that Plaintiff is unable to carry out detailed instructions or make complex decisions due to pain, R. 21, and he incorporated this into his RFC determination, R. 25.

Dr. Vijapura's diagnosis was major depression, recurrent.  R. 221.  He placed Plaintiff on a trial of Cymbalta and Plaintiff was to return.  *Id.*  Apparently Plaintiff did not return, and a short time later he told Dr. Shores that he was doing better.  R. 259.  A GAF score of 50 was assigned by Dr. Vijapura on Axis V, with a past GAF of 60.  *Id.*  This indicates that the sustained GAF range for Plaintiff was from 50 to 60.  This is substantial evidence in the record from which one might conclude, as the ALJ did, that Plaintiff suffers moderate limitations in social functioning from depression.  While the score of 50 suggests more significant limitations, this was the score before medication was prescribed.  Plaintiff was doing better a short time later after he took the medication.  A score in the range of 51 to 60 indicates that the patient has "moderate difficulty in social, occupational, or school functioning."[21]  The ALJ also found that due to

---

[21] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.'  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Manual at 34.  GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

pain, Plaintiff was unable to carry out detailed instructions or make complex decisions.

While this finding was based upon Plaintiff's experience of chronic pain, it effectively

took into account the possibility that Plaintiff's depression causes similar limitations.

In summary, it does not appear that the ALJ seriously disregarded the evidence

from Dr. Vijapura.  Even if he did, however, Dr. Vijapura was only a consultant and had

no ongoing treatment relationship with Plaintiff, so the ALJ was not required to give his

opinion substantial weight.  A consultative examination, that is, a one-time examination

by a physician who is not a treating physician, need not be given deference by the

Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).  Thus, while a

residual functional capacity assessment by a consulting physician can be substantial

evidence to support a hypothetical to a vocational expert, Johansen v. Barnhart, 314

F.3d 283, 288 (7th Cir. 2002), there is contrary authority.  Kelley v. Callahan, 133 F.3d

583, 589 (8th Cir.1998) ("opinion of a consulting physician who examines a claimant

once or not at all does not generally constitute substantial evidence.").  Therefore, the

ALJ's determination of Plaintiff's residual functional capacity with respect to mental

health limitations is supported by substantial evidence.

### Whether the ALJ erred in finding that Plaintiff can perform his past relevant work as a truck driver

Plaintiff contends that the ALJ's finding that Plaintiff could return to his work as a

truck was error since he regularly took strong pain medication, including OxyContin, and

Nurse Practitioner Breland advised against operating heavy machinery while taking

---

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  Axis V of the
DSM-IV Multiaxial System is explained at:
http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

medications with sedative effects.  R. 289.  Plaintiff also contends that it was error to pose a hypothetical to the vocational expert that failed to include limitations posed by Plaintiff's experience of pain and side effects from pain medications.  This failure, argues Plaintiff, resulted in the vocational expert finding that the hypothetical person could do work as an assembler of small products.

The pain aspect of the hypothetical has been addressed above.  The ALJ determined that Plaintiff is unable to carry out detailed instructions or make complex decisions due to pain, R. 21, and he incorporated this into his residual functional capacity determination, R. 25.  This limitation was in his hypothetical to the vocational expert.    R. 329-330.

This leaves the question of whether limitations caused by side effects from pain medications should have been in the hypothetical to the vocational expert.  As pointed out by Defendant, Plaintiff testified that he had not been taking prescription pain medications for about four months prior to the hearing (on January 29, 2007) because his insurance ran out and he could not afford the medication.  R. 313-314.  The medical record does contain a warning about side effects, but no objective evidence that Plaintiff suffered from serious side effects.

But even if it was error to find that Plaintiff could return to his truck driving job, Plaintiff has not shown that it was error to find that Plaintiff could do work as a small products assembler.  There is nothing in the record to indicate that taking pain medications would preclude that sort of employment.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  The decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on November 6, 2008.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**